UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| BOBBIE ABELL,<br><br>                      Plaintiff,<br><br>v.<br><br>TRANS UNION LLC<br><br>                      Defendant. | Civil Action No.: 2:23-cv-02378<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

      Bobbie Abell ("Plaintiff" or "Ms. Abell") a living, breathing 74-year-old consumer, brings this action on an individual basis, against Trans Union LLC ("Trans Union" or "Defendant") and states as follows:

**INTRODUCTION**

      1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

      2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the national consumer reporting agencies acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. Trans Union sells information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason.

> Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiff's claims arise out of Trans Union's blatantly inaccurate credit reporting, wherein Trans Union reported to Plaintiff's potential creditors that she is "deceased" and does not have a credit score.

12. Accordingly, Plaintiff brings claims against Trans Union for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

13. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

14. Bobbie Abell ("Plaintiff" or "Ms. Abell") is a natural person residing in Cookeville, Tennessee, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15. Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of Tennessee, including within this District. Trans Union can be served through its registered agent Illinois Corporation Service Company at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

16. Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS
### Summary of the Fair Credit Reporting Act

19. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

22. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**The Credit Bureau Defendants' Practices Concerning the Sale of Reports on the "Deceased"**

24. Trans Union sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

25. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Trans Union, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

26. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Trans Union, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

27. Trans Union routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

28. Trans Union's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

29. Trans Union does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

30. Trans Union does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

31. Trans Union does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32. In some cases, in order to assure accuracy, Trans Union may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Tennessee. Trans Union does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

33. Trans Union regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But Trans Union does not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

34. Trans Union will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

35. Trans Union fails to employ reasonable procedures that assure that a consumer with a "deceased" mark on her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

36. Even in instances where other data on the face of the consumer's report indicates that the consumer is not deceased, Trans Union does not employ any procedures to assure that a consumer with a "deceased" mark on their report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

37. Even in instances where the purportedly deceased consumer communicates directly with Trans Union, Trans Union does not employ any procedures to assure that a consumer with a "deceased" mark on their report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

38. Once a "deceased" mark is placed upon a consumer's report, Tans Union will not calculate and will not provide a credit score for that consumer.

39. Even though Trans Union will sell reports to third parties that contain a "deceased" mark, Trans Union will not calculate or provide a credit score for the consumer that is the subject of the report, rather only providing "N/A" for the consumer's credit score.

40. Trans Union knows that third party credit issuers require a credit score in order to process a given credit application.

41. Trans Union knows that consumers without credit scores are unable to secure any credit from most credit issuers.

42. Trans Union knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

43. Trans Union has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because the Trans Union is inaccurately reporting them as "deceased" and without a credit score.

44. Trans Union has received and documented many disputes from consumers complaining that Trans Union had erroneously marked them as "deceased" on their credit reports.

45. Trans Union knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code, even when said consumers are not on the Death Master File and are in fact alive.

46. Nevertheless, Trans Union does not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is in fact deceased.

47. Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance decides to change the code.

48. Trans Union does not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

49. Nor does Trans Union employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

50. For years after a consumer's actual death, Trans Union will continue to sell credit reports about that consumer.

51. Trans Union will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

52. Trans Union charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

53. Trans Union profits from the sale of reports on deceased consumers.

54. Trans Union has in its respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

55. Trans Union knows that truly deceased consumers do not apply for credit.

56. Trans Union knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Trans Union to be a common and major source of identity theft.

57. Trans Union knows that identity theft and credit fraud are serious and widespread problems in our society.

58. Trans Union warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

59. Trans Union has no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

60. Trans Union sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

61. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Trans Union to sell their credit reports, absent a court order.

62. Trans Union knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Applies for a Kohls Credit Card**

63. Some time ago, Plaintiff had a Kohls credit card, which she enjoyed.

64. Sometime in or about April 2023, Plaintiff noticed that her Kohls credit card was closed.

65. Plaintiff decided that she would again like to make purchases from Kohls with the use of a Kohls credit card.

66. In April 2023, Plaintiff applied for a new Kohls credit card.

**Kohls Denies Plaintiff's Credit Card Application**

67. In or about May 1, 2023, Plaintiff received a denial letter from Kohls, dated April 25, 2023.

68. Upon reading the letter, Plaintiff was horrified to learn that Kohls not only denied her credit but did so because it had reason to believe that she was deceased.

69. According to the Kohls adverse action letter, Trans Union had reported to Kohls that Plaintiff was deceased.

70. Specifically Kohls stated: "We regret that we are unable to approve your request at this time for the following reason(s): Your credit bureau report indicates you are deceased."

71. Kohls then stated that its "credit decision was based in whole or in part on information obtained in a report from" Trans Union.

72. Plaintiff was shocked at any assertion that she was deceased. After all, she had a very active credit file, including other lines of revolving credit as well as a current home mortgage.

73. Further, Plaintiff made payments on her other lines of credit, including her mortgage.

74. In disbelief, Plaintiff logged into her social security administration account concerned that the issue was widespread. But nothing in her social security administration account suggested that Plaintiff was deceased.

75. As a senior citizen who regularly receives Social Security checks, Plaintiff was increasingly distressed that there had been a major mistake involving her credit file and worried about her benefits.

76. Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

77. As a result of the "deceased" notation, Defendant made it practically impossible for Plaintiff to continue to obtain credit.

78. At all times pertinent hereto, Defendant Trans Union was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

79. At all times pertinent hereto, the conduct of Defendant Trans Union, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

80. As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the credit furnisher, like AMEX and BOA here, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only

superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

81. Trans Union is aware of the shortcomings of its procedures and intentionally choose not to comply with the FCRA to lower its costs. Accordingly, Trans Union's violations of the FCRA are willful.

82. As a result of Defendants conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

83. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

84. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

85. On numerous occasions, Trans Union prepared patently false consumer reports concerning Plaintiff.

86. Despite actual and implied knowledge that Plaintiff is not dead, Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

87. Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

88. As a result of Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

89. Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

90. Plaintiff is entitled to recover attorneys' fees and costs Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendant Trans Union negligently and/or willfully violated the FCRA;
ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;
iii. Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,
iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Respectfully Submitted this 22nd day of June 2023.

By: /s/Tarek N. Chami
Tarek N. Chami – MI# P76407
*Of Counsel for Consumer Attorneys*
CHAMI LAW, PLLC
22000 Michigan Ave, Suite 200

Dearborn, MI 48124
T: (313) 444-5029
tchami@consumerattorneys.com
*Attorney for Plaintiff*
*Bobbie Abell*